## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

KYLEB WILD,
        Petitioner,

        v.                                      No. 15-cv-1526 (VAB)

KRISTA ELIOT,
        Respondent.

## MEMORANDUM OF DECISION AND ORDER

Petitioner, Kyleb Wild, brings this petition against Respondent, Krista Eliot, under the

Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No.

11,670, 1343 U.N.T.S. 89, 19 I.L.M. 1501 (the "Hague Convention" or the "Convention"), as

implemented in the United States by the International Child Abduction Remedies Act, 22 U.S.C.

§ 9001 *et seq.* ("ICARA"), seeking the return to Mexico of their four year-old son, A. E.-W.

Upon the findings of fact and conclusions of law set forth below, the request is DENIED.

## I.     FINDINGS OF FACT

After holding an evidentiary proceeding on November 12, 2015, the Court makes the

following factual findings under Federal Rule of Civil Procedure 52(a)(1), based on the

testimony, written submissions, and exhibits presented by the parties.

Kyleb Wild and Krista Eliot met as fellow students in a graduate program of

anthropology at the University of California, San Diego ("UCSD") in 2003.  They married in

July 2008 in Maine.  Respondent gave birth to A. E.-W at the end of 2010, while the couple was

still living and attending school in San Diego.  During their years living in San Diego, Mr. Wild

and Ms. Eliot rented various apartments, but were often away for lengthy periods of time in other

1

countries doing field research.  For example, Ms. Eliot lived in Egypt and Israel from 2006
through 2009, and the couple got engaged in 2007 in Uganda, where Mr. Wild was living at the
time.  In 2013, the family resided in university housing at UCSD, but their lease was coming to
an end, and they needed to find a new place to live.  At the time, both parents taught part-time at
various community colleges around San Diego, and were in the process of looking for full-time
academic jobs.

Ms. Eliot took the lead in exploring the family's housing options, and discovered that
they could no longer afford to live in San Diego, nor in any of the surrounding neighborhoods on
the United States side of the border with Mexico,[1] given the market-rate housing costs and the
costs for pre-school for their son.  However, the family had a babysitter for A. E.-W. who was a
United States citizen who lived in Tijuana and commuted across the border for work.  This gave
Ms. Eliot the idea to begin researching housing options in Mexico.  She determined renting a
home in Mexico and commuting to work in the United States would be the family's best option,
and eventually Mr. Wild agreed.  Ms. Eliot set up viewings of rental units with realtors, and
ultimately the couple chose one they liked best.  The couple signed a one-year lease, beginning
in June 2013, for a three bedroom house in a gated community in Tijuana, Mexico.  They
terminated their lease in San Diego and moved all their property to their new home.  There was
no discussion about the permanency of the move or even the length of their stay.

Indeed, the proximity of the new home to San Diego allowed Mr. Wild and Ms. Eliot to
move without having to make any clear decision about the implications of life in Mexico.  The
new home was only about fifteen minutes from the border with the United States.  Mr. Wild and
Ms. Eliot continued to work at their part-time teaching jobs in San Diego, commuting into the

---

[1] Pursuant to Federal Rule of Evidence 201, the Court takes judicial notice of the fact that the city of San Diego
shares a border with Mexico.

United States on a frequent basis.  They maintained their California drivers' licenses, as well as a post office box in the United States to receive at least some of their mail, such as packages from Amazon.com.  Moreover, Mr. Wild maintained his voting registration in California in order to vote in U.S. presidential elections, and Mr. Wild and Ms. Eliot filed a joint U.S. federal tax return in April 2014.

Neither Mr. Wild nor Ms. Eliot made any effort to establish themselves permanently or on a lengthy basis in the country of Mexico.  To the contrary, Mr. Wild and Ms. Eliot did not need any documentation to cross the border back into San Diego from Tijuana, when they traveled there for work or other visits.  Neither did they apply for permanent residency or citizenship in Mexico because, as Mr. Wild understood it, the process was expensive and would take a few years.

They also did not change A.E.W.'s pediatrician and continued to bring him into the United States for health care visits, as well as for a variety of other reasons, such as trick-or-treating on Halloween and birthday parties for A. E.-W.'s friends.  When the lease ended, the family continued to live in the house in Tijuana on a month-to-month basis.

Mr. Wild's father, who stayed with the family for three months in 2013, then moved permanently from Kansas in August 2014, into a house on the same street as A. E.-W.  A. E.-W. would spend time with his grandfather at both his home and his grandfather's home.  A. E.-W. also enrolled in and began attending a pre-school in Mexico.

While they were living in Mexico, Mr. Wild and Ms. Eliot were open to moving their family from Mexico if they obtained full-time academic jobs necessitating relocation, and both of them looked at opportunities in the United States, Canada, Europe, and Asia.  They would not necessarily have moved if they found positions in the San Diego area.  Ms. Eliot also suggested

that it might be advisable for the family to move even further south into Mexico, in order to obtain lower rent for a nicer house.  In addition, Ms. Eliot suggested that the couple cut back on commuting into the United States by, for example, teaching online classes from their home in Mexico.  Ms. Eliot began teaching her first online class in January 2015.

Living in Mexico from the age of approximately twenty-nine months to the age of approximately fifty months, A. E.-W. was gaining increasing proficiency in the Spanish language.  However, A. E.-W.'s primary language was still English.  His parents were also trying to learn Spanish through audio lessons, though neither had achieved sufficient proficiency to teach in Spanish.

Eventually, the relationship between Mr. Wild and Ms. Eliot became strained to the point that Mr. Wild moved out on January 29, 2015.  He moved in with his father, six houses away, and he and his spouse worked out an informal joint custody schedule.  The couple generally adhered to this schedule until February 26, 2015.  On that date, Ms. Eliot took A. E.-W. from Mexico to the United States without informing Mr. Wild and without his consent.  When Mr. Wild sent a text message to Ms. Eliot that morning asking, "why are [A. E.-W.'s] school backpack and clothes at home? did you bring him to school today? where is he?", Ms. Eliot responded that she took A. E.-W. with her to pick up her parents, who were coming to visit, and that "All is well".  This was not true.  Ms. Eliot's parents were not coming to visit; rather, Ms. Eliot took the child to California, and then to Connecticut.  Ms. Eliot and A. E.-W. currently reside with Ms. Eliot's parents in Hamden, Connecticut.

On March 2, 2015, Ms. Eliot filed applications for a domestic violence restraining order and for custody in California state court.  The restraining order was denied, custody was granted, and a hearing on the matters was scheduled for March 18, 2015.  However, Ms. Eliot left

California on March 4, 2015, arriving in Hamden, Connecticut, on March 6, 2015.  She then filed applications for custody and a restraining order in Connecticut state court on March 12, 2015. As with the California matters, the Connecticut court denied the restraining order, granted custody, and scheduled the matters for a hearing.  When Ms. Eliot did not attend the March 18th hearing in California, the California matters were dismissed.  The Connecticut matters were scheduled for a hearing on March 25, 2015.

During this period, Mr. Wild also commenced court actions.  Upon the advice of counsel that it would be the best way to regain custody of A. E.-W., Mr. Wild filed for divorce in San Diego.  Ms. Eliot moved to quash that action based on lack of jurisdiction.  She argued that they did not meet the residency requirement in California for jurisdiction over a dissolution proceeding.  The California court agreed, finding that "they are not a resident of California" because "the issue is residency, not where you maintain a driver's license or voter reg[istration]." The motion to quash was granted and thus the case was dismissed.

Because of the uncertainty over California's jurisdiction over the divorce proceeding, Mr. Wild also filed a divorce and custody action in Mexico.  Ms. Eliot has appeared in that action through counsel.  The Mexico action and the Connecticut action are both still pending.  In the course of the Connecticut action, Mr. Wild and Ms. Eliot have agreed temporarily to certain visitation rights for Mr. Wild.

## II.    CONCLUSIONS OF LAW

The following constitutes the Court's conclusions of law under Federal Rule of Civil Procedure 52(a)(1).

The Hague Convention "was adopted in 1980 in response to the problem of international child abductions during domestic disputes." *Abbott v. Abbott*, 560 U.S. 1, 8 (2010).  The stated

5

purposes of the Hague Convention are "(a) to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and (b) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, art. 1. Thus,

> [t]he Hague Convention is primarily concerned with the use of force to establish artificial jurisdictional links on an international level, with a view to obtaining custody of a child. . . . [It] was especially aimed at the unilateral removal or retention of children by those close to them, such as parents, guardians, or family members. To deter family members from removing children to jurisdictions more favorable to their custody claims in order to obtain a right of custody from the authorities of the country to which the child has been taken, the Hague Convention attempts to deprive their actions of any practical or juridical consequences. The Convention consequently places at the head of its objectives the restoration of the status quo[.]

*Gitter v. Gitter*, 396 F.3d 124, 129-30 (2d Cir. 2005) (internal quotation marks and citations omitted). Both the United States and Mexico are Contracting States. In 1988, the United States enacted ICARA to implement the Hague Convention in this country.

Under ICARA,[2] the petitioner has the burden of proving by a preponderance of the evidence that the child's removal was wrongful within the meaning of the Convention. 22 U.S.C. § 9003(e)(1)(A). The Convention provides that

> [t]he removal or the retention of a child is to be considered wrongful where (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3. Thus, the three[3] essential elements that Mr. Wild must establish to prevail in this action are: (1) that A. E.-W. was "habitually resident" in one State and has been removed or retained in a different State; (2) that the removal or retention was in breach of Mr.

---

[2] ICARA's provisions are "in addition to and not lieu of the provisions of the Convention." 22 U.S.C. § 9001(b)(2).
[3] The Hague Convention also provides that it "shall cease to apply when the child attains the age of 16 years." Hague Convention, art. 4. It is undisputed that A. E.-W. is currently four years old.

Wild's custody rights under the law of the State of habitual residence; and (3) that Mr. Wild was exercising those rights at the time of the removal or retention.  The Court must deny the relief sought in Mr. Wild's petition because he has failed to establish Mexico as A. E.-W.'s habitual residence.

"The Hague Convention, itself, does not provide any definition of 'habitually resident.'" *Gitter*, 396 F.3d at 131.  The Second Circuit, however, has instructed that "courts should begin an analysis of a child's habitual residence by considering the relevant intentions," *i.e.*, the intentions of those "entitled to fix the place of the child's residence, which is likely to be the parents in most cases[,] . . . as of the last time that their intentions were shared."  *Id.* at 132-33 (internal quotation marks and citation omitted).  "[G]enerally speaking the first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind." *Id.* at 132 (internal quotation marks and citation omitted); *see also Guzzo v. Cristofano*, 719 F.3d 100, 110 (2d Cir. 2013) (first step of the *Gitter* test is to determine "whether the evidence offered at trial showed settled mutual intent from which abandonment of the prior habitual residence can be inferred") (internal quotation marks omitted).  In addition, while a court "can reasonably infer a mutual abandonment of the child's prior habitual residence" where "the parents . . . shared a settled mutual intent that the stay last indefinitely," there are cases where "circumstances are such that, even though the exact length of the stay was left open to negotiation, the court is able to find no settled mutual intent from which such abandonment can be inferred."  *Mozes v. Mozes*, 239 F.3d 1067, 1077 (9th Cir. 2001).

In addition to parental intent, "a change in geography is a necessary condition to a child acquiring a new habitual residence."  Finally, courts "must consider whether, notwithstanding the intent of those entitled to fix the child's habitual residence, the evidence points unequivocally

to the conclusion that the child has become acclimatized to his new surroundings and that his habitual residence has consequently shifted." *Id.* at 133.

Where Mr. Wild's petition fails is in demonstrating that he and his spouse formed a settled intention to abandon the United States as A. E.-W.'s habitual residence. Mr. Wild and Ms. Eliot are both American citizens who have lived much of their lives in the United States. They met in the United States, were married in the United States, and their child was born in the United States. The parents were in a transitional period in their lives. They were finishing up their doctoral programs and were looking for full-time academic jobs. While they physically moved to Mexico, they retained many indicia of residency in the United States, such as their drivers' licenses and mailing address. They continued to work on a routine basis in the United States, and regularly brought A. E.-W. back into the United States. Many of the full-time jobs they were considering were in the United States, while none were in Mexico. Significantly, there was no testimony that either Mr. Wild or Ms. Eliot made any effort to establish themselves permanently or on a lengthy basis in the country of Mexico. The Court thus cannot find by a preponderance of the evidence that they both agreed to abandon the United States and move A. E.-W.'s habitual residence to Mexico. *See*, *e.g.*, *Ruiz v. Tenorio*, 392 F.3d 1247, 1254 (11th Cir. 2004) (affirming finding that parents never had a shared intention to abandon prior habitual residence where, *inter alia*, "there were numerous objective facts indicating [the mother's] lack of intention to move permanently to Mexico," *i.e.*, retention of bank accounts and credit cards in the U.S., having her American mail forwarded to an American address, and obtaining a nursing license in Florida shortly after moving to Mexico); *Poliero v. Centenaro*, 373 F. App'x 102, 105 (2d Cir. 2010) (the fact that the family "maintained continuous connections with Italy, even though they did not live there the majority of the year," supported a finding that they had not

abandoned Italy as the children's habitual residence, "despite deciding to come to the U.S. for a relatively lengthy period of time").

This couple may have lived in Mexico for some period of time with their young child, but there is an insufficient basis for this Court finding that the couple intended to abandon the United States as a habitual residence.  The evidence is fairly clear that the two parents wanted nothing more than to be close to San Diego and not necessarily to be in Mexico.  Mr. Wild's testimony alone demonstrates a desire to take advantage of Mexico's close proximity to the United States without having to relinquish any of the advantages of living in the United States.  He believes he can go back and forth between the two countries at will, without ever having to establish any official residency in Mexico.  While this may be true as a matter of law—and this Court does not and need not decide that issue—it undermines his claim, one premised on having abandoned habitual residency in the United States.  To be clear, the Court is not issuing a broad pronouncement about whether those who live close to the border of the United States in a neighboring country could ever abandon their habitual residence here.  It is only stating that the Petitioner in this case has failed to prove by a preponderance of evidence that this couple intended to abandon the United States for Mexico.

The fact that Mr. Wild's father left his home in Kansas and moved to Mexico to be close to A. E.-W. and that the family did spend some time in Mexico does not change that conclusion. While it is true that "a habitual residence may be established even when a move is for a limited period and indeed indefinite," *Ermini v. Vittori*, 758 F.3d 153, 162 (2d Cir. 2014), the family's move to Mexico in this case did not evince a sufficient "degree of 'settled purpose' and continuity," *id.*, that would enable this Court to find Mexico to be A. E.-W.'s habitual residence. Unlike in *Ermini*, the facts in this case do not establish by a preponderance of the evidence even

that "the family intended to shift the locus of their family life" to Mexico for a span of time. *Id.* at 163. Rather, the evidence indicates that much of the family's life—employment, health care, and social matters, such as trick-or-treating and children's birthday parties with A. E.-W.'s friends—centered on the United States.

As noted *supra*, even without a finding of a settled intention by A. E.-W.'s parents to abandon the United States as his habitual residence, the Court must consider whether A. E.-W. has become acclimatized to Mexico to the extent that his habitual residence has shifted. The Second Circuit has cautioned, however, that "courts should be slow to infer that the child's acclimatization trumps the parents' shared intent." *Gitter*, 396 F.3d at 134. To find a change in habitual residence without a finding of shared parental intent, "the child's acclimatization to the location abroad will be so complete that serious harm to the child can be expected to result from compelling his return to the family's intended residence." *Id.* "This is a difficult test to satisfy," which is only met "if the child's relative attachments to the two possible habitual residences have changed to the point where requiring return to the original forum would now be tantamount to taking the child out of the family and social environment in which its life has developed." *Poliero v. Centenaro*, 373 F. App'x at 105 (internal quotation marks and citations omitted).

A. E.-W. was in Mexico for twenty-one months, a significant portion of his young life up to the point he was relocated back to the United States by his mother. In this case, however, this is still not "an amount of time sufficient for acclimatization." *Gitter*, 396 F.3d at 131 (quoting *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir.1995)); *see also Mota v. Castillo*, 692 F.3d 108, 109-11, 116 (2d Cir. 2012) (duration of two years spent by five year-old child living in the United States, away from her "loving, supportive home in Mexico," and with only her father because her mother was repeatedly prevented by the U.S. government from coming to the United

States, "is not nearly so great that [the Second Circuit] could presume that returning her to Mexico would expose her to the severe harm one associates with a child's deprivation of her acclimatized life") (internal quotation marks omitted); *Poliero v. Centenaro*, No. 09-cv-2682, 2009 U.S. Dist. LEXIS 83665, at *43-68 (E.D.N.Y. Aug. 14, 2009) (Report and Recommendation), *adopted*, 2009 WL 2947193, at *14-21 (E.D.N.Y. Sept. 11, 2009) (holding that children from Italy had not acclimatized to the United States when they had spent a "non-continuous and intermittent period of 18 months" in the United States, returning to Italy for holidays and "extensive vacations of several months," and were enrolled in the only school in United States recognized by the Italian Ministry of Education, taking half of their classes in Italian) (internal quotation marks omitted). A. E.-W. spent much of the time he was living in Mexico back in the United States. English was still by far his predominant language. Many of A. E.-W.'s social relationships and other attachments were based in the United States and not Mexico. At a minimum, the Court must find that the evidence does not unequivocally point to the conclusion that the child had acclimatized to Mexico.

In sum, the Court finds that the Petitioner has not established by a preponderance of the evidence that A. E.-W.'s habitual place of residence was Mexico prior to his unilateral removal to the United States by Respondent.

## III.    CONCLUSION

For the reasons stated above, the Court concludes that, as of February 26, 2015, A. E.-W.'s habitual residence was the United States, not Mexico, so that his removal of by Ms. Eliot was not "wrongful" under the Hague Convention because she was not removing him from what was then A. E.-W.'s habitual place of residence.

Accordingly, it is ORDERED that Mr. Wild's petition for return of the A. E.-W. to Mexico is DENIED and judgment to that effect shall enter forthwith.

SO ORDERED at Bridgeport, Connecticut, this 25th day of November, 2015.

    /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge